Per Curiam:
This case arises from a contract dispute between Dr. Stanley Hatesohl, a family medicine doctor, and his former employer, Central Kansas Medical Center (CKMC), d/b/a St. Rose Ambulatory and Surgery Center (St. Rose). CKMC is a nonprofit general corporation that is licensed to operate an ambulatory surgical center (ASC). CKMC contracted with Dr. Hatesohl to provide family medicine services at St. Rose for two years. This contract contained several postemployment covenants. After two years, Dr. Hatesohl resigned and began practicing family medicine at Great Bend Regional Hospital's (GBRH) Central Kansas Family Practice clinic (CKFP).
CKMC sued Dr. Hatesohl for violating the postemployment covenants and GBRH and CKFP for tortiously interfering with the contract. The Barton County District Court granted summary judgment for the defendants on the grounds that the contract between CKMC and Dr. Hatesohl violated the Kansas corporate practice of medicine doctrine. This doctrine forbids a corporation from hiring a physician to practice medicine that the corporation itself is not licensed to provide. The Court of Appeals reversed and remanded.
We conclude the district court was correct and hold the contract between CKMC and Dr. Hatesohl violated the corporate practice of medicine doctrine. Consequently, we reverse the decision of the Court of Appeals and affirm the district court's grant of summary judgment.
FACTUAL AND PROCEDURAL BACKGROUND
Dr. Hatesohl is a licensed physician who is board certified in family medicine. In September 2012, he moved to Great Bend to practice family medicine at CKMC, d/b/a St. Rose. He entered into a two-year employment contract with CKMC to provide family *1256 medicine services at St. Rose until September 30, 2014. The contract stated that Dr. Hatesohl "shall provide a minimum of forty (40) hours of professional Family Medicine services at [St. Rose's] Family Medicine clinic, known as St. Joseph Family Medicine Clinic ... or such other site or sites as may be mutually agreed upon." The contract also required Dr. Hatesohl to "perform other medical and related duties, including, to the extent applicable to a physician practicing Family Medicine, as determined by [St. Rose]."
The contract contained postemployment covenants that generally prohibited Dr. Hatesohl from doing the following for one year after his employment with St. Rose ended: practicing family medicine within a 50-mile radius of St. Rose; employing St. Rose's staff; and soliciting St. Rose's patients and staff. The contract also forbid Dr. Hatesohl from disclosing or misusing St. Rose's confidential and proprietary information.
At first, Dr. Hatesohl worked in St. Rose's family medicine clinic. But soon, CKMC integrated its family medicine and urgent care practices into one clinic, called St. Rose Family Medicine and Urgent Care. In March 2014, Dr. Hatesohl submitted a letter of resignation, citing frustration with the integration. However, he later rescinded his resignation and worked at St. Rose for the remainder of the contractual period.
In August 2014, Dr. Hatesohl notified St. Rose that he would not renew his contract. When rumors circulated that Dr. Hatesohl was considering employment nearby, Centura Health Corp. (Centura), St. Rose's managing organization, sent him a letter stating its intent to enforce the postemployment covenants. Counsel for Dr. Hatesohl replied that the covenants were not binding because the contract "violates the Kansas prohibitions against the corporate practice of medicine [doctrine]."
On October 1, 2014-the day after his contract with St. Rose expired-Dr. Hatesohl entered into an employment contract with GBRH to practice family medicine at CKFP, which was located across the street from St. Rose. Around that time, Dr. Hatesohl forwarded emails from his St. Rose account to his personal one, which contained information that St. Rose claims was confidential. At CKFP, Dr. Hatesohl continued to treat around 50-60 patients from St. Rose.
In November 2014, CKMC petitioned for injunctive relief and damages against Dr. Hatesohl, GBRH, and CKFP, alleging: (1) Dr. Hatesohl breached his contract by competing within a 50-mile radius of St. Rose, soliciting its patients and staff, and misappropriating its confidential information; (2) GBRH and CKFP (referred to collectively as GBRH from now on) tortiously interfered with Dr. Hatesohl's contract with St. Rose; and (3) Dr. Hatesohl was unjustly enriched. CKMC also moved for a restraining order and a temporary injunction to prevent Dr. Hatesohl from violating the postemployment covenants.
Dr. Hatesohl and GBRH countered that the contract was unenforceable because it violated Kansas' common law prohibition against the corporate practice of medicine, as set forth in two key cases: Early Detection Center, Inc. v. Wilson , 248 Kan. 869, 811 P.2d 860 (1991), and St. Francis Regional Med. Center, Inc. v. Weiss , 254 Kan. 728, 869 P.2d 606 (1994). In Early Detection Center , this court held that "[a] general corporation is prohibited from providing medical services or acting through licensed practitioners" and any such contract is unenforceable. 248 Kan. at 880, 811 P.2d 860. In St. Francis , this court recognized a statutory exception that permits a corporation with a hospital license to contract for the services of licensed physicians. 254 Kan. at 746, 869 P.2d 606. Relying on these cases, they argued St. Rose violated the prohibition against the corporate practice of medicine by acting outside the scope of its ASC license to employ Dr. Hatesohl to practice family medicine.
That same month, the Barton County District Court held a hearing on the motion for a restraining order. The court denied that motion and scheduled an evidentiary hearing on the temporary injunction motion for December. Meanwhile, CKMC filed a reply in support of its motion for a temporary injunction, arguing the St. Francis exception extends to any licensed medical care facility, including *1257 St. Rose. Thus, CKMC claimed St. Rose could employ Dr. Hatesohl without violating the corporate practice of medicine doctrine.
In December 2014, the court held a three-day evidentiary hearing on the temporary injunction motion. Leanne Irsik, senior vice-president and site administrator of Centura at St. Rose, testified about CKMC's corporate structure and medical licenses. She explained that CKMC is a Kansas nonprofit general corporation that operates as St. Rose. At that time, St. Rose offered a variety of medical services that were housed in separate departments: primary care, laboratory, imaging, cardiopulmonary/sleep lab, home health and hospice, general surgery, and ASC. St. Rose held an ASC medical care facility license, as well as pharmacy, home health, and radiation materials licenses.
Irsik testified that Dr. Hatesohl worked in the primary care clinic called St. Rose Family Medicine and Urgent Care. He had privileges to provide consulting services in the ASC department but did not have privileges to perform surgeries there. Irsik affirmed that family medicine "is a branch of medicine that addresses the care of a patient from the beginning to the end of life and focuses on general health and wellness of patients" whereas an ASC provides primarily surgical and diagnostic services to patients who can stay no longer than 24 hours. She emphasized that the primary care clinic and the ASC operated as separate sections of St. Rose and had separate identifying numbers for billing purposes. But all payments ultimately flowed to CKMC.
Irsik also traced the history of CKMC's medical care facility licenses. Until 2011, CKMC was licensed as a hospital. But in January 2011, CKMC sent a letter to the Kansas Department of Health and Environment (KDHE) declaring its intention to transition to "an outpatient model, including comprehensive urgent care services, same-day surgery and cancer care." The letter explained, "As part of this transition, CKMC will terminate its hospital license and seek licensure for part of its existing facility as an ambulatory surgery center. The entire new facility will now be referred to as St. Rose Ambulatory & Surgery Center."
In April 2011, the KDHE granted St. Rose a medical care facility license that recognized St. Rose as "a Kansas ambulatory surgical center as defined at KAR 28-34-50 et seq." See K.A.R. 28-34-50(b)(2) (defining an ASC as "an establishment with ... permanent facilities that are equipped and operated primarily for the purpose of performing surgical procedures and do not provide services or other accommodations for patients to stay more than 24 hours"). The next month, the KDHE sent a letter confirming that CKMC "is no longer doing business as a Kansas licensed general hospital." Since then, St. Rose has renewed its ASC license each year.
The parties entered St. Rose's ASC license applications into evidence. Each application asked St. Rose to designate the type of medical care facility license requested: general hospital, ASC, critical access hospital, or special hospital. St. Rose checked the ASC box each time. Each application also contained a check-box list of "optional organized services, departments, or units" and asked St. Rose to indicate any it provided. The list included surgery, obstetrical, pediatric, and physical therapy departments, among others. St. Rose checked only the "surgery department" box each time.
Dr. Hatesohl testified on his own behalf. He explained that family medicine is a specialty that cares for the whole family, from birth to death. A family medicine practitioner may perform minor surgical procedures, such as laceration repair and fracture care, but not major ones. As Dr. Hatesohl summarized:
"We're typically ... the specialty that patients see first for medical problems. If they come in with a cough, shortness of breath, chest pain, typically, we're what are considered the gatekeepers of the medical system.... [W]e can do some initial testing and determine if they need to go see a cardiologist or a pulmonologist, or need to be hospitalized, or whether they can, you know, safely have surgery, that sort of issues."
Dr. Hatesohl provided preoperation evaluations for his patients who were going to have surgery, no matter where the surgery *1258 would take place. He needed no privileges to perform these evaluations. But he did have privileges with St. Rose to provide consultations to clear patients for surgery. He explained:
"In my role at St. Rose ... these privileges were specifically for patients that didn't have a primary doctor to do pre-op clearance, or they came in that morning of surgery and there was either some sort of issue going on, possibly an abnormal EKG, possibly some respiratory difficulties, some sort of issue that the surgeon was questioning whether the patient was appropriate to undergo general anesthesia."
However, Dr. Hatesohl did not recall providing this consulting at St. Rose. He applied for-but did not receive-privileges to perform minor procedures at St. Rose, such as shoulder dislocation and laceration repairs. As a result, Dr. Hatesohl never had surgical privileges at St. Rose.
The parties also presented extensive evidence about Dr. Hatesohl's alleged contract breaches and the healthcare needs of Great Bend. But that evidence is not germane to this appeal, given the procedural posture of the case and the sole question petitioned for review-whether the district court erred when it granted summary judgment because the contract violated the corporate practice of medicine doctrine.
In February 2015, the defendants moved for summary judgment on all counts, claiming the undisputed facts showed that CKMC's ASC license did not cover family medicine, and therefore, its contract with Dr. Hatesohl violated the corporate practice of medicine doctrine. In response, CKMC moved for summary judgment on its breach of contract and tortious interference claims, arguing St. Rose was a licensed medical care facility that could contract with Dr. Hatesohl under St. Francis . CKMC also argued that no Kansas statute or regulation prohibited St. Rose from employing Dr. Hatesohl to practice family medicine.
At this point, CKMC moved to join St. Catherine's Hospital (St. Catherine) as a necessary plaintiff because CKMC had recently transferred its right to enforce Dr. Hatesohl's contract to St. Catherine as part of a corporate change. CKMC also moved for leave to file an amended petition, which would assert the following new claims: (1) tortious interference against Dr. Hatesohl's wife, Ann Hatesohl; (2) intentional spoliation of evidence against Dr. Hatesohl and Ann; and (3) unjust enrichment against GBRH. Dr. Hatesohl did not contest the addition of St. Catherine but reserved the right to challenge any additional claims against himself and his wife. GBRH opposed only the motion to add the unjust enrichment claim.
Later that month, the district court denied the temporary injunction and granted summary judgment for the defendants by email, stating the contract was illegal pursuant to Early Detection Center and St. Francis. In April 2015, the court formalized the ruling in a journal entry containing findings of fact and conclusions of law. On appeal, the parties dispute only the conclusions of law, which state in relevant part:
"2. Defendant Hatesohl entered in the Employment Agreement, which is the subject of this action, on July 30, 2012 with CKMC. The main provision of the contract was his agreement to provide a minimum of 40 hours a week of professional family medicine services.... At the time of signing the contract, CKMC was not operating under a hospital license, but under a license as an ambulatory surgical center ('ASC'), as defined in K.S.A. 65-425(f). CKMC never had a license as a hospital during the contract time with Defendant Hatesohl. CKMC's ASC license did not authorize it to provide family practice medical services in a clinic.
"3. The Employment Agreement is illegal and thus unenforceable because it violates Kansas public policy that forbids a corporation from employing licensed medical doctors to provide medical services to third-parties that the corporation is not licensed to perform. See Early Detection Center, Inc. v. Wilson , 248 Kan. 869 [811 P.2d 860] (1991) ( [']A general corporation is prohibited from providing medical services or acting through licensed practitioners; therefore, there can be no contract between the general corporation and third parties to perform medical services').
*1259 "4. Wilson also stated, 'it is well settled both in law and equity that the courts will not aid either party to an illegal agreement. The law leaves the parties where it found them.' Id . at 879 [811 P.2d 860]. Therefore, the [post-employment] covenants ... are unenforceable and invalid.
"5. In St. Francis Medical Center, Inc. v. Weiss , 254 Kan. 728 [869 P.2d 606] (1994), the Court acknowledged its precedent, which rejected corporate ownership of medical practices, Id . at 734 [869 P.2d 606], but found them distinguishable because the plaintiff was a licensed hospital. Weiss does not support the [argument that the] Employment Agreement is enforceable because CFMC's [sic ] medical license, as an ASC, did not extend to provision of family practice medical services in a clinic.
"6. CFMC's [sic ] claims of tortious interference with contract and unjust enrichment both require the Employment Agreement to have been legal and enforceable. Therefore, the above rulings make moot any contentions of interference with contract and unjust enrichment."
For the same reasons, the court denied CKMC's motion for summary judgment and motion to amend the petition. The court also declined to add St. Catherine as a necessary party because it was in privity with CKMC and bound by the judgment. Finally, the court assessed costs against CKMC. CKMC promptly appealed the ruling.
When the parties later disputed costs, the court awarded $3,309.70 to Dr. Hatesohl and $1,882.10 to GBRH, with postjudgment interest at the highest amount authorized by statute. CKMC appealed the costs order, and the two cases were consolidated on appeal.
In the Court of Appeals, CKMC argued the district court erred by: (1) granting summary judgment for the defendants; (2) denying its motion to join St. Catherine as a plaintiff; (3) denying its motion to add new claims against the Hatesohls; and (4) awarding costs and postjudgment interest to the defendants. The panel reversed on all four grounds and remanded for further proceedings. Central Kansas Medical Center v. Hatesohl , No. 113,675, 2016 WL 1079481 (Kan. App. 2016) (unpublished opinion).
The panel reversed summary judgment for three primary reasons. First, the panel believed the district court erroneously held that St. Rose "was the equivalent of its ambulatory surgical center clinic." 2016 WL 1079481, at *18. Instead, the panel believed the ASC was just one of many departments within St. Rose. Second, the panel held the plain language of the Kansas statutes and regulations governing ASCs does not forbid an ASC from providing family medicine services or restrict it to providing only surgery. 2016 WL 1079481, at *9-10. Third, the panel held the contract did not violate the Kansas prohibition against the corporate practice of medicine. In so doing, the panel extended the St. Francis exception-for corporations with a hospital license-to corporations with an ASC license, like CKMC. 2016 WL 1079481, at *15.
Dr. Hatesohl and GBRH petitioned for review of the panel's reversal of summary judgment. CKMC filed no cross-petition. Thus, the only question before us is whether the district court erred when it held the contract between CKMC and Dr. Hatesohl violated the Kansas corporate practice of medicine doctrine and granted summary judgment for the defendants. See Supreme Court Rule 8.03(h)(1) (2018 Kan. S. Ct. R. 56) (generally "the issues before the Supreme Court include all issues properly before the Court of Appeals which the petition for review or cross-petition allege were decided erroneously by the Court of Appeals"). Indeed, the remaining issues depend on whether summary judgment was proper in the first place.
ANALYSIS
The core question in this appeal is whether an exception to the corporate practice of medicine doctrine permitted CKMC to lawfully contract with Dr. Hatesohl to practice family medicine. To answer this, we must first determine whether the rationale of St. Francis -which held that a corporation with a hospital license may contract for the services of a physician-applies with equal force to a corporation with an ASC license. If so, we must next consider whether Dr. Hatesohl's *1260 family medicine practice fell within the scope of CKMC's ASC license. This requires us to examine the plain language of the medical licensing scheme in tandem with the undisputed facts about Dr. Hatesohl's family medicine practice. The bottom line is, the corporate practice of medicine doctrine forbids a corporation from contracting with a physician to practice medicine that the corporation itself is not licensed to perform. Any contract in contravention of this doctrine is unenforceable.
We hold the logic of St. Francis permits a corporation with an ASC license to hire physicians to practice medicine within the scope of that license . An ASC is authorized to operate "primarily for the purpose of performing surgical procedures." K.S.A. 65-425(f). When an ASC offers a medical service that falls outside this scope, it violates the corporate practice of medicine doctrine. Here, Dr. Hatesohl's family medicine practice fell outside the scope of CKMC's ASC license because it bore no relation to the surgical procedures at St. Rose. Accordingly, we hold the contract between Dr. Hatesohl and CKMC is unenforceable, reverse the Court of Appeals, and affirm the district court's grant of summary judgment for the defendants.
The standard for reviewing summary judgment is well established:
" 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' " Armstrong v. Bromley Quarry & Asphalt, Inc. , 305 Kan. 16, 24, 378 P.3d 1090 (2016).
See K.S.A. 2017 Supp. 60-256(c)(2). Thus, we review the district court's grant of summary judgment de novo. Netahla v. Netahla , 301 Kan. 693, 696, 346 P.3d 1079 (2015).
Likewise, the interpretation of statutes and administrative regulations presents questions of law subject to de novo review. In this endeavor, we must give effect to the intent expressed by the plain language of the text. Pener v. King , 305 Kan. 1199, 1208, 391 P.3d 27 (2017). This means we give common words their ordinary meanings, without adding to or subtracting from the text as it appears. We only resort to textual construction when the language is ambiguous. State v. Gray , 306 Kan. 1287, 1294, 403 P.3d 1220 (2017) ; State v. Prine , 297 Kan. 460, 474-75, 303 P.3d 662 (2013). And we give no deference to an agency's interpretation of its regulations. May v. Cline , 304 Kan. 671, 675, 372 P.3d 1242 (2016).
The Corporate Practice of Medicine Doctrine
We begin our analysis by clarifying the contours of the corporate practice of medicine doctrine. Beginning with Winslow v. Board of Dental Examiners , 115 Kan. 450, 452, 223 P. 308 (1924), this court held a corporation cannot practice dentistry through the employment of a licensed dentist. The court soon extended this rule to optometry, holding that "the practice of the [optometry] profession is limited to individuals, and that corporations cannot be chartered to engage therein." State, ex rel., v. Goldman Jewelry Co. , 142 Kan. 881, 890, 51 P.2d 995 (1935) ; see State, ex rel., v. Zale Jewelry Co. , 179 Kan. 628, 633, 298 P.2d 283 (1956) (prohibiting a jewelry company from practicing optometry through the employment of a licensed optometrist).
These early decisions rested on "judicial interpretation that the licensure requirements apply to persons and not to corporations." Early Detection Center , 248 Kan. at 874, 811 P.2d 860. For example, Winslow held the licensing scheme contemplated a *1261 "personal" practice of dentistry because: "Corporations may not be graduated from dental colleges, they have neither learning nor skill, and they may not be examined, registered, nor licensed as dentists. Therefore the legislature does not permit the organization of a domestic corporation to practice dentistry." 115 Kan. at 452, 223 P. 308. Likewise, Goldman reasoned that a corporation was disqualified from practicing optometry because the governing statutes required an optometrist to be a person who was at least 21 years old and possessed certain education credentials. Thus, the corporate practice of medicine doctrine derived from the legislative intent inherent in the medical licensing statutes, which limited the practice of medicine to licensed persons.
Next, in Early Detection Center , the court considered whether a general corporation could lawfully provide noninvasive vascular testing medical services through licensed physicians. Part of the analysis centered on what effect, if any, subsequent statutory enactments had on prior caselaw. After the early cases but before Early Detection Center , the Legislature enacted the Kansas Healing Arts Act (HAA), K.S.A. 65-2801 et seq., and the Professional Corporation Law of Kansas (PC Law), K.S.A. 17-2706 et seq. L. 1957, ch. 343, § 1 (HAA); L. 1965, ch. 157, § 1 (PC Law). Generally, the HAA prohibits a person from practicing any branch of the healing arts without a license, and the PC Law permits licensed physicians to form professional corporations to provide medical services. See K.S.A. 2017 Supp. 65-2803(a) (HAA) ; K.S.A. 17-2709(a) and K.S.A. 2017 Supp. 17-2707(b)(9) (PC Law).
The Early Detection Center court construed these acts as supplementing, rather than replacing, prior caselaw. As the court explained,
"The Healing Arts Act was passed in 1957, subsequent to our decision in State , ex rel., Fatzer v. Zale Jewelry Co. , 179 Kan. 628 [298 P.2d 283 (1956) ]. The legislature, in drafting the language of the Healing Arts Act, did not define or broaden the word 'person' such that its meaning differed from our decisions in Winslow , Goldman , and Zale .
"Where a statute has been construed by the highest court having jurisdiction to pass on it, such constructions are as much a part of the statute as was written into it originally. All statutes are presumed to be enacted with full knowledge of the existing condition of the law and with reference to it. State, ex rel., v. Moore, 154 Kan. 193, 199, 117 P.2d 598 (1941). The legislature in drafting the language of the Healing Arts Act did not change the prior judicial interpretation that the licensure requirements apply to persons and not to corporations." 248 Kan. at 873-74 [811 P.2d 860].
The court also noted that the Legislature carved out a statutory exception for professional corporations to practice medicine through licensed physicians but did not do so for general corporations. 248 Kan. at 875-77, 811 P.2d 860.
Ultimately, the Early Detection Center court affirmed prior caselaw and held that "[a] general corporation is prohibited from providing medical services or acting through licensed practitioners; therefore, there could be no contract between the general corporation and the third parties to perform the services." 248 Kan. at 880, 811 P.2d 860. We later summarized Early Detection Center 's rationale this way:
"This court's basic rationale in refusing to enforce the agreement between Early Detection Center and Dr. Wilson was as follows: In Kansas, the practice of medicine requires a license. An examination must be taken in order to obtain a license. Because only individuals can take examinations, only individuals can be licensed to practice medicine. The Zale, Goldman, and Winslow cases, decided in 1956, 1935, and 1924, respectively, equated a corporation's employing a licensed professional individual who practiced dentistry or optometry with a corporation's practicing that profession. When the legislature subsequently enacted the Healing Arts Act, the Professional Corporation Law, and the General Corporation Code [ K.S.A. 2017 Supp. 17-6001 et seq. ], it had the opportunity to include provisions which would have changed the judicial interpretation, but it did not do so. Thus, the rule that a general *1262 corporation is prohibited from providing medical services or acting through licensed practitioners still applies." St. Francis , 254 Kan. at 734-35, 869 P.2d 606.
Most recently, in St. Francis , this court recognized an exception to the corporate practice of medicine doctrine for corporations licensed as hospitals. In St. Francis , a nonprofit corporation with a hospital license sought to enforce the liquidated damages provision of its employment contract with a doctor who resigned. The doctor moved for summary judgment, claiming the contract was unenforceable according to Early Detection Center , but the district court denied the motion. On appeal, this court held that a corporation with a hospital license could contract for the services of a physician. 254 Kan. at 746, 869 P.2d 606.
The St. Francis decision hinged on the fact that the corporation was "a hospital licensed by the State of Kansas as a medical care facility and a health care provider." 254 Kan. at 746, 869 P.2d 606. In contrast, the corporation in Early Detection Center was an unlicensed diagnostic clinic. And this distinction made all the difference. In Early Detection Center , the court found no statutory exception to save the corporation from the default rule that an unlicensed corporation cannot practice medicine through licensed practitioners. 248 Kan. at 876-77, 811 P.2d 860. But the St. Francis court observed that the medical care facility licensing statutes, K.S.A. 65-425 et seq., not only permit a corporation to be licensed as a hospital but also require a licensed hospital to employ physicians to accomplish its statutorily defined purpose. 254 Kan. at 744-46, 869 P.2d 606.
The St. Francis court explained that K.S.A. 65-425(h) defines "medical care facility" as "a hospital, ambulatory surgical center or recuperation center." 254 Kan. at 744, 869 P.2d 606 ; see K.S.A. 65-425(j) (the term "hospital" is divided into three types: "general hospital," "critical access hospital," and "special hospital"). These medical care facilities must be licensed by the KDHE. K.S.A. 65-427 ; K.S.A. 65-425(e). As defined by statute, a "general hospital" must provide "physician services" and "diagnosis and treatment for patients who have a variety of medical conditions." K.S.A. 65-425(a). In the same vein, a "special hospital" must provide "physician services" and "diagnosis and treatment for patients who have specified medical conditions." K.S.A. 65-425(b). The court also noted that the Kansas Health Care Provider Insurance Availability Act (HCPIAA) defines "health care provider" to include a "medical care facility licensed by the state of Kansas." K.S.A. 2017 Supp. 40-3401(f) ; 254 Kan. at 737, 869 P.2d 606.
Given this, the court held that a corporation licensed as a hospital is required by statute to provide physician services to treat patients. 254 Kan. at 744-45, 869 P.2d 606. Moreover, the court reasoned that "[i]t would be incongruous to conclude that the legislature intended a hospital to accomplish what it is licensed to do without utilizing physicians as independent contractors or employees." 254 Kan. at 745, 869 P.2d 606. Thus, the court recognized "what is and has been a reality for decades-hospitals employ physicians." 254 Kan. at 745, 869 P.2d 606. After all, "[w]ithout physicians, nurses, and medical technicians, a hospital cannot achieve that for which it is created and licensed-to treat the sick and injured." 254 Kan. at 745, 869 P.2d 606.
Finally, the court determined that permitting licensed hospitals to employ physicians would not harm the public welfare or run afoul of prior caselaw. 254 Kan. at 746, 869 P.2d 606. The court distinguished St. Francis from past precedent, explaining:
"As previously noted, in Early Detection Center, Inc. v. Wilson, 248 Kan. 869, 811 P.2d 860 (1991), we relied upon the cases of Winslow, Goldman, and Zale. The basic rationale for those decisions was that to permit a corporation to practice a licensed profession would be injurious to the public welfare. Such a prohibition was necessary to protect the public health....
....
"None of these early cases dealt with a hospital's employing a physician nor prohibited such employment. None of these cases dealt with a corporation in the business of providing health care to the general public. We agree that Early Detection Center should not be extended beyond its *1263 facts and is distinguishable from the present case. Here, the corporation employing the physician is a hospital licensed by the State of Kansas as a medical care facility and a health care provider. This difference is crucial to our determination and it distinguishes a hospital from a 'diagnostic clinic,' which was involved in Early Detection Center. " 254 Kan. at 745-46, 869 P.2d 606.
Therefore, the court held that "neither Kansas case law nor statutory law prohibits a licensed hospital from contracting for the services of a physician. Such contracts are not contrary to the interest of public health, safety, and welfare and, therefore, are legally enforceable." 254 Kan. at 746, 869 P.2d 606.
To recap, from Winslow to St. Francis , this court has affirmed the general rule that a corporation cannot circumvent the medical licensing scheme by hiring a physician to practice medicine that the corporation is not licensed to provide. In Early Detection Center , the court recognized that the Legislature-with full knowledge of the corporate practice of medicine doctrine-carved out an exception for physicians to form professional corporations but did not abolish the default rule. See Cochran v. Kansas Dept. of Agriculture , 291 Kan. 898, 906, 249 P.3d 434 (2011) (" '[C]ourts presume the legislature acts with knowledge of existing statutory and case law when it enacts legislation.' "); City of Haven v. Gregg , 244 Kan. 117, 122, 766 P.2d 143 (1988) ("In Kansas, the common law remains in force, unless modified by constitutional amendment, statutory law, or judicial decision."). Later in St. Francis , the court held another statutory exception exists for corporations licensed as hospitals.
Because no party asks us to overturn this precedent, we apply it on the basis of stare decisis and will not question its validity sua sponte. See Hoesli v. Triplett, Inc. , 303 Kan. 358, 362-63, 361 P.3d 504 (2015) ("points of law established by a court are generally followed by the same court and courts of lower rank in later cases in which the same legal issue is raised"); Rhoten v. Dickson , 290 Kan. 92, 117, 223 P.3d 786 (2010) ("Appellate courts do not ordinarily consider issues the parties failed to raise unless an issue's consideration is necessary to serve the ends of justice or to prevent the denial of fundamental rights."). Accordingly, we now turn to the question presented: whether an exception to the corporate practice of medicine doctrine allowed CKMC to contract with Dr. Hatesohl to practice family medicine.
An exception to the corporate practice of medicine doctrine permits an ASC to hire physicians to practice medicine within the scope of the ASC license.
At the outset, we note that no party directs us to any statute that authorizes a general corporation to provide medical services without a medical care facility license. And upon our review, we also found none. Given this, CKMC's power to provide family medicine services must arise from its ASC license.
Generally, St. Francis charts the course for a corporation with an ASC license to lawfully hire physicians within the bounds of its statutorily defined purpose. Like the licensed hospital in St. Francis , a licensed ASC is a "medical care facility" and "health care provider" under the relevant statutes. See K.S.A. 65-425(h) (defining "medical care facility" to include an ASC); K.S.A. 2017 Supp. 40-3401(f) (defining "health care provider" under the HCPIAA to include "a medical care facility licensed by the state of Kansas"). As the Court of Appeals said,
"It makes little practical sense to allow a licensed hospital to contract for the services of a physician but to prohibit a licensed ambulatory surgical center from contracting for the services of a physician since both of these entities are included within the definition of a 'medical care facility' at K.S.A. 65-425(h)." Hatesohl , 2016 WL 1079481, at *15.
But more importantly, the statutory definition of an ASC plainly calls for the employment of physicians to treat patients. K.S.A. 65-425(f) defines an ASC as:
"an establishment with an organized medical staff of one or more physicians; with permanent facilities that are equipped and operated primarily for the purpose of performing surgical procedures ; with continuous *1264 physician services during surgical procedures and until the patient has recovered from the obvious effects of anesthetic and at all other times with physician services available whenever a patient is in the facility; with continuous registered professional nursing services whenever a patient is in the facility; and which does not provide services or other accommodations for patient to stay more than 24 hours. Before discharge from an ambulatory surgical center, each patient shall be evaluated by a physician for proper anesthesia recovery. Nothing in this section shall be construed to require the office of a physician or physicians to be licensed under this act as an ambulatory surgical center." (Emphasis added.)
The corresponding regulation contains the same definition, though organized differently. See K.A.R. 28-34-50(b) (defining an ASC).
In this way, the definition of an ASC expressly requires the employment of physicians to practice medicine-such as performing surgery, administering anesthesia, and monitoring recovery-in order to operate "primarily for the purpose of performing surgical procedures." K.S.A. 65-425(f). Furthermore, the implementing regulations require an ASC to hire medical staff to carry out its purpose. See K.S.A. 65-431(a) (the KDHE "shall adopt, amend, promulgate and enforce such rules and regulations and standards with respect to the different types of medical care facilities to be licensed hereunder"). For example, the regulations state that an ASC "shall have an organized medical staff," which may include surgeons, anesthesiologists, and even dentists. K.A.R. 28-34-54(a) ; see K.A.R. 28-34-54(e) (surgeons) ; K.A.R. 28-34-56a(b)(1) (anesthesiologists) ; K.A.R. 28-34-50(p) (dentists). In light of this, it would be "incongruous" to conclude that the Legislature intended an ASC "to accomplish what it is licensed to do without utilizing physicians as independent contractors or employees." St. Francis , 254 Kan. at 745, 869 P.2d 606. Indeed, it would be absurd. See Northern Natural Gas Co. v. ONEOK Field Services Co. , 296 Kan. 906, 918, 296 P.3d 1106 (2013) ("we must construe statutes to avoid unreasonable or absurd results"). Thus, a corporation with an ASC license may, if not must, hire licensed physicians to comply with these rules.
Our decision in St. Francis was premised on the fact that the Legislature authorized corporations licensed as hospitals to provide medical services to the public. So too here: the Legislature authorized corporations licensed as ASCs to provide medical services, and it is within the Legislature's power to create such exception to the corporate practice of medicine doctrine. As the Illinois Supreme Court aptly said:
"[T]he General Assembly has broad regulatory power with respect to the health-care professions, and it is within the discretion of the legislature to not only determine what is required in the public interest and welfare, but also to determine the measures needed to secure such interest.... It is within the province of the legislature, in the exercise of its broad regulatory power, to expand the exception to the corporate practice doctrine by expanding the types of corporate entities that are required to submit to licensing requirements and regulatory oversight before they may provide medical services to the public. In this way, a corporation, wishing to employ physicians, may demonstrate its qualifications and accept its responsibilities as a licensed and regulated participant in the medical care system." Carter-Shields, M.D. v. Alton Health Inst. , 201 Ill. 2d 441, 462, 268 Ill.Dec. 25, 777 N.E.2d 948 (2002).
Therefore, we hold the corporate practice of medicine doctrine does not apply to a corporation with an ASC license that operates in compliance with statutory and regulatory mandates.
At this point, we pause to resolve a disagreement between the lower courts and clarify the analytical path forward. In short, the lower courts disagreed about whether CKMC's ASC license applied to the entire facility or just the "ASC," or surgery department. The district court held CKMC's ASC license covered the entire facility, and all of its departments fell under that umbrella. But the Court of Appeals held CKMC's ASC license applied to a subset of medical services, *1265 like its pharmacy, home health, and radiation materials licenses. Hatesohl , 2016 WL 1079481, at *8. We adopt the district court's view because it best reflects the medical care facility licensing framework, as summarized below, and clarify that the corporate practice of medicine doctrine requires Dr. Hatesohl's practice to fall within the scope of CKMC's ASC license.
A corporation may apply to the KDHE to obtain a license to operate a medical care facility. K.A.R. 28-34-127(a) (2017 Supp.) ("Any person desiring to operate a facility shall apply for a license on forms provided by the department."); K.A.R. 28-34-126(j) (2017 Supp.) (" 'Person' means any individual, firm, partnership, corporation, company, association, or joint-stock association, and the legal successor thereof."); K.S.A. 65-425(c) (same definition of "person"). Again, a "medical care facility" is defined as "a hospital, ambulatory surgical center or recuperation center." K.S.A. 65-425(h). Each type of medical care facility is authorized to provide a distinct scope of medical services. See K.S.A. 65-431(c) ("In formulating rules and regulations, the [licensing] agency shall give due consideration to the size of the medical care facility, the type of service it is intended to render, the scope of such service and the financial resources in and the needs of the community which such facility serves."). For example, a "general hospital" must provide medical services "for not less than 24 hours of every day" in order "to provide diagnosis and treatment for patients who have a variety of medical conditions." K.S.A. 65-425(a). In contrast, an ASC must be "equipped and operated primarily for the purpose of performing surgical procedures" and cannot "provide services or other accommodations for patient to stay more than 24 hours." K.S.A. 65-425(f) ; K.A.R. 28-34-50(b).
To carry out its mission, a medical care facility may provide medical services that require separate licensing. For example, K.A.R. 28-34-59a(a) states: "The ambulatory surgical center shall provide, either directly or through agreement, laboratory, radiology, and pharmacy services to meet the needs of the patients." If an ASC provides these services directly, then it must follow the rules specific to those services, which are separately licensed and regulated. See K.A.R. 28-34-59a(b)(1) (A laboratory "shall hold a valid CLIA certificate for the type and complexity of all tests performed."); 42 C.F.R. § 493.1 et seq. (Clinical Laboratory Improvement Amendments of 1988 [CLIA] ); K.A.R. 28-34-59a(d) (Radiology services "shall meet the requirements specified in K.S.A. 48-1607, and amendments thereto."); K.S.A. 48-1607(a) and K.S.A. 48-1603(o) (authorizing the secretary of the KDHE to provide rules for radioactive material licensing); K.A.R. 28-35-175a (2017 Supp.) et seq. (radioactive material licensing rules); K.A.R. 28-34-59a(h) ("The pharmaceutical service ... shall be provided in accordance with K.A.R. 68-7-11."); K.A.R. 68-7-11 (pharmacy rules).
Taken together, these statutes and regulations establish that a corporation may be licensed to operate a medical care facility, and each type of medical care facility is authorized to provide a distinct scope of medical services. Within that scope, a medical care facility may (or in some circumstances, must) provide medical services that require separate licensing. CKMC's ASC license authorized it to operate "primarily for the purpose of performing surgical procedures." K.S.A. 65-425(f) ; K.A.R. 28-34-50(b). To accomplish this purpose, CKMC was required to provide laboratory, radiology, and pharmacy services (called "ancillary services") to meet the needs of patients. K.A.R. 28-34-59a(a). Thus, the district court correctly held that CKMC's ASC license covered the facility as a whole . Because of this, Dr. Hatesohl's practice-like any medical service CKMC offered-had to fall within the scope of its ASC license to satisfy the corporate practice of medicine doctrine.
Dr. Hatesohl's family medicine practice fell outside the scope of CKMC's ASC license, and as a result, his contract with CKMC violated the corporate practice of medicine doctrine.
If CKMC hired Dr. Hatesohl to perform surgery, this case would end here. The Legislature created an exception to the corporate practice of medicine doctrine for a corporation with an ASC license to hire physicians *1266 to practice medicine within the scope of that license: to operate "primarily for the purpose of performing surgical procedures." K.S.A. 65-425(f). Of course, performing surgery falls within that scope. But Dr. Hatesohl was hired to practice family medicine, and it is undisputed that he had no privileges to perform surgical procedures at St. Rose. At most, he had consulting privileges to clear patients for surgery, which he never used. Thus, we next consider the plain language of K.S.A. 65-425, as well as the implementing regulations, to determine whether Dr. Hatesohl's practice fell within the scope of an ASC license.
K.S.A. 65-425 does not mention family medicine, so to speak. K.S.A. 65-425(f) defines an ASC as an establishment "with permanent facilities that are equipped and operated primarily for the purpose of performing surgical procedures" that provides continuous physician services during surgical procedures and recovery. The statute also contemplates the administration of anesthesia and limits a patient's stay to 24 hours. Beyond this, the statute is silent about what medical services an ASC may provide while operating "primarily for the purpose of performing surgical procedures." K.S.A. 65-425(f). The parties debate how to construe this language and how the list of "ancillary services" in K.A.R. 28-34-59a(a) informs its meaning.
Dr. Hatesohl and GBRH argue K.S.A. 65-425(f) limits the scope of an ASC license to medical services that are integral to surgery. To illustrate, they contrast a general hospital's broad mandate to "provide diagnosis and treatment for patients who have a variety of medical conditions," with an ASC's narrow mandate to operate "primarily for the purpose of performing surgical procedures." Compare K.S.A. 65-425(a) with K.S.A. 65-425(f). They point out that an ASC is the only medical care facility that, by definition, cannot accommodate a patient more than 24 hours, suggesting it was designed for same-day surgery. See generally K.S.A. 65-425. They also claim the list of "ancillary services" that an ASC must provide is either exclusive or, at the very least, informative about what services are integral to surgery. See K.A.R. 28-34-59a(a). In sum, they argue Dr. Hatesohl's practice did not belong in an ASC because it was not integral to surgery.
CKMC claims K.S.A. 65-425(f) and the related regulations give ASCs wide latitude to offer medical services apart from surgery. CKMC emphasizes that K.S.A. 65-425(f) does not require ASCs to provide surgery exclusively . Similarly, CKMC argues the list of "ancillary services" in K.A.R. 28-34-59a(a) is not exclusive but instead sets minimum requirements. CKMC also points out that no statute or regulation prohibits an ASC from providing family medicine services. In essence, CKMC argues an ASC may provide family medicine services because nothing prohibits it from doing so.
The Court of Appeals agreed with CKMC, reasoning:
"Both K.S.A. 65-425(f) and the corresponding administrative regulation, K.A.R. 28-34-50(b), state that an ambulatory surgical center is 'an establishment ... with permanent facilities that are equipped and operated primarily for the purpose of performing surgical procedures.' (Emphasis added.) The statute and regulation do not say 'operated exclusively for the purpose of performing surgical procedures,' and GBRH points to no authority for such a limited reading.
"As CKMC points out, it was also licensed to provide services other than surgical procedures; it held licenses for its pharmacy, home health agency, and radiation materials. No party points to any statute or regulation that requires a specific license for a medical care facility to offer family medicine services. In addition, K.A.R. 28-34-59a(a) actually requires ambulatory surgical centers to 'provide, either directly or through agreement, laboratory, radiology, and pharmacy services to meet the needs of the patients.' The fact that the legislature expressly allows an ambulatory surgical center to directly provide services other than surgical procedures flies in the face of [the] notion that Kansas policy limits an ambulatory service center to only provide surgical services." 2016 WL 1079481, at *9.
In the end, the panel suggested that an ASC could provide a broad scope of medical *1267 services, stating: "Like a hospital, an ambulatory surgical center may-and in some cases must-provide services other than those directly involving surgery, especially when the facility is also licensed to provide other medical services including a pharmacy, home health services, and radiation services." 2016 WL 1079481, at *15.
We agree with CKMC and the panel that the scope of an ASC license is not limited exclusively to surgical procedures. But we disagree that the scope is expansive enough to cover Dr. Hatesohl's family medicine practice, which bore no relation to St. Rose's surgical procedures.
The plain language of K.S.A. 65-425(f) requires an ASC to operate "primarily for the purpose of performing surgical procedures." Clearly, a medical service that is necessary to perform surgery safely falls within this scope. For example, the list of "ancillary services" falls into this category. See K.A.R. 28-34-59a(a) ("The ambulatory surgical center shall provide ... laboratory, radiology, and pharmacy services to meet the needs of the patients ." [Emphasis added.] ). Indeed, common experience tells us that a person undergoing a surgical procedure may need to have an x-ray done, blood taken, or medicine prescribed. But importantly, the list of "ancillary services" is not exclusive. K.A.R. 28-34-59a(a) contains no language that limits an ASC to providing only the medical services listed or prohibits it from providing additional ones. And elsewhere, the ASC regulations mention other medical services that may be necessary for surgery, such as dentistry or anesthesiology. See K.A.R. 28-34-54(l) (dentistry) ; K.A.R. 28-34-56a(b)(1) (anesthesiology). Thus, the regulations establish the minimum set of services that an ASC must offer while permitting it to provide additional medical services to meet the needs of patients.
At the other end of the spectrum, a medical service that bears no relation to surgical procedures falls outside the scope of an ASC license. K.S.A. 65-425 authorizes a general hospital to treat a variety of medical conditions but limits an ASC to operating primarily for surgery. To permit an ASC to provide medical services that are unrelated to its surgical purpose would erase the distinction the Legislature made between the medical care facilities and would defy K.S.A. 65-425's plain language. That said, we will not determine the fate of medical services that lie between these two extremes today because the facts do not present the opportunity to do so. Based on the facts specific to this case, we hold Dr. Hatesohl's family medicine practice fell outside the scope of CKMC's ASC license because it bore no relation to the surgical procedures at St. Rose.
The relevant facts are undisputed. CKMC contracted with Dr. Hatesohl only to practice family medicine, which is a specialty that cares for the family from birth to death and serves as a gatekeeper to the medical system. Though Dr. Hatesohl could perform minor surgical procedures as part of this specialty, CKMC denied his application for privileges to do so. Furthermore, the relationship between Dr. Hatesohl's practice and the surgery department at St. Rose was tenuous at best. As part of his practice, Dr. Hatesohl provided preoperation evaluations for his patients, no matter where they planned to have surgery-it was not specific to St. Rose. Though Dr. Hatesohl had privileges at St. Rose to clear patients for surgery who had no primary care doctor, he never used them. This suggests that such consultations were not part of Dr. Hatesohl's regular practice. To summarize, Dr. Hatesohl never had surgical privileges with St. Rose; he supplied no medical services to the surgery department; and CKMC hired him to provide primary care, nothing more.
In conclusion, the evidence shows that Dr. Hatesohl's family medicine practice bore no relation to the surgical procedures at St. Rose. Because of this, Dr. Hatesohl's practice fell outside the scope of CKMC's ASC license. Put differently, CKMC hired Dr. Hatesohl to practice medicine that the corporation was not licensed to perform. This means the contract between Dr. Hatesohl and CKMC violated the corporate practice of medicine doctrine.
"[I]t is well settled both in law and in equity that the courts will not aid either party to an illegal agreement." Early Detection Center , 248 Kan. at 879, 811 P.2d 860 ; see *1268 Petty v. City of El Dorado , 270 Kan. 847, 854, 19 P.3d 167 (2001) ("The public policy of a state is the law of that state as found in its constitution, its statutory enactments, and its judicial decisions. ... Contracts in contravention of public policy are void and unenforceable."); Wycoff v. Quick Way Homes, Inc. , 201 Kan. 442, 447, 441 P.2d 886 (1968) ("Illegal contracts are generally unenforceable."). Because the contract between Dr. Hatesohl and CKMC is unenforceable, we reverse the Court of Appeals and affirm the district court's grant of summary judgment for the defendants.
Reversed.