NOT DESIGNATED FOR PUBLICATION

No. 119,438

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Equalization Appeals
of KANSAS STAR CASINO, L.L.C.
for the Years 2016 and 2017 in Sumner County, Kansas.

MEMORANDUM OPINION

Appeal from the Kansas Board of Tax Appeals. Opinion filed May 8, 2020. Affirmed in part, vacated in part, and remanded with directions.

*Jarrod C. Kieffer* and *Frank W. Basgall*, of Stinson LLP, of Wichita, for appellant/cross-appellee Kansas Star Casino, L.L.C.

*Andrew D. Holder* and *David R. Cooper*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, for appellee/cross-appellant Sumner County.

Before BRUNS, P.J., MALONE and GARDNER, JJ.

BRUNS, P.J.: Kansas Star Casino L.L.C. filed this judicial review action appealing the decision of the Board of Tax Appeals (BOTA) establishing a valuation of its real property located in Sumner County for the purpose of imposing ad valorem tax for the 2016 and 2017 tax years. In response, Sumner County filed a cross-petition for judicial review. Previously, the parties have sought judicial review each year since the 2012 tax years. Although the issues presented have varied somewhat in each appeal, the issues presented in this appeal are nearly identical to the issues presented in Kansas Star's appeal for the 2015 tax year. See *In re Equalization Appeal of Kansas Star Casino*, No. 116,782, 2018 WL 3486173 (Kan. App. 2018) (unpublished opinion).

1

Both parties agree that BOTA's decision should be reversed—albeit for different reasons. Kansas Star contends that BOTA erred in finding that an arena located on the real property should be depreciated by one-third rather than finding that the arena was obsolete. In response, Sumner County contends that BOTA's depreciation analysis does not comport with the Uniform Standards of Professional Appraisal Practice (USPAP) and that BOTA overestimates the amount of functional obsolescence for the arena. Moreover, in its cross-appeal, Sumner County contends that BOTA's determination of the per acre land value for the non-agricultural land is not supported by substantial evidence; that BOTA's rejection of the inclusion of a 12.5% entrepreneurial profit is not USPAP-compliant nor is it supported by substantial evidence; and that BOTA erred by failing to consider the management contract between Kansas Star and the State as part of its analysis of fair market value.

For reasons set forth in this opinion, we affirm BOTA's decision in all respects other than its determination of depreciation and functional obsolescence of the Kansas Star Arena. We vacate that portion of BOTA's decision and remand this issue for reconsideration and for a determination of its impact on the overall valuation of the subject property for the purpose of imposing ad valorem tax for the 2016 and 2017 tax years.

FACTS

The pertinent facts were set forth in our opinion issued in *In re Equalization Appeal of Kansas Star Casino*, 2018 WL 3486173, at *1-8. Moreover, the parties are very familiar with the facts. Accordingly, we will simply summarize the facts in this opinion and discuss them as necessary in our analysis.

Kansas Star operates one of the four state-sponsored gaming enterprises in Kansas. The casino's operation is authorized under the Kansas Expanded Lottery Act (KELA),

2

K.S.A. 74-8733 et seq. Under KELA, the Kansas Legislature established a process under which the State owns the gaming operations at the four authorized casinos. In turn, the State contracts with a gaming facility manager to construct and own the casino's infrastructure and to manage the gaming operations at each location.

Kansas Star—operating under its parent company—is the lottery gaming facility manager for the south central gaming zone and owns the subject property. On the property, it operates as the Kansas Star Casino and Arena Events Center. Under KELA, four gaming zones were created. Although each zone is generally subject to the same requirements, the south central and northeast zones required a $225 million minimum investment in infrastructure while the southeast and southwest gaming zones required only a $50 million minimum investment. See K.S.A. 74-8734(g)(2). In addition to the Kansas Star Casino in Mulvane, the three other locations with state-owned casinos are the Hollywood Casino in Kansas City, Boot Hill Casino in Dodge City, and Kansas Crossing Casino in Pittsburg.

Under KELA, the Kansas Lottery Commission is allowed to enter into management contracts with private entities to construct and manage the State's facilities. K.S.A. 74-8734(a), (d). However, these contracts "place full, complete and ultimate ownership and operational control of the gaming operation . . . with the Kansas lottery." K.S.A. 74-8734(h)(17). All contracts are required to include terms and conditions for "ancillary lottery gaming facility operations" under K.S.A. 74-8734(h)(7), defined to mean "additional non-lottery facility game products and services . . . [which] may include, but are not limited to, restaurants, hotels, motels, museums or entertainment facilities." K.S.A. 74-8702(a). Likewise, the Kansas Lottery Commission is the licensee and owner of all software programs associated with lottery facility games, and all such games are subject to the ultimate control of the lottery. See K.S.A. 74-8734(n)(1), (2).

3

In 2010, Peninsula Gaming—Kansas Star's former parent company—entered into a management contract with the State. Under the agreement, 22% of all gaming revenue is paid to the State, 2% is paid to the problem gaming and addictions fund, 2% is paid to Sumner County, and 1% is paid to Sedgwick County. Furthermore, Kansas Star must turn all of the gaming revenue over to the Kansas Lottery Commission on a daily basis.

Paragraph 14 of the management contract requires Peninsula to:

"diligently construct the buildings and related improvements for its Ancillary Lottery Gaming Facility Operations substantially in accordance with [its] Application for Lottery Gaming Facility Manager . . . and [its] representations to the Kansas Lottery Commission, Lottery Gaming Facility Review Board, the Kansas Racing and Gaming Commission, or the governing body of the city or county where the Lottery Gaming Facility is to be located . . . ."

Moreover, the management contract provides:

"In addition to any other remedy available . . . under this Agreement, solely with respect to this Paragraph 14, [Peninsula's] failure to substantially perform its Ancillary Lottery Gaming Facility Operations obligations according to objectively verifiable standards (for example, if the plans provide for the building of a restaurant and the restaurant is not built) and, provided such failure cannot be disputed in good faith, will authorize the [Kansas Lottery] to withhold payment of [Peninsula's] compensation for which it would otherwise be entitled . . . less such amounts necessary . . . to meet all cash operating payments, obligations and liabilities payable pursuant to the Budget and debt service payments payable to third-party lenders . . . ."

The subject property sits on two formerly separate tracts of land, referred to as the Wyant and Gerlach tracts. Kansas Star's former parent company acquired both the Wyant and Gerlach tracts in July 2010, for a total purchase price of $17 million. The subject property is within the city limits of Mulvane. However, the land is located in a rural, mostly undeveloped area west of the city. The land around the casino is sparsely

4

populated and used mostly for farming. We note that approximately two acres of the real property has been leased to the City of Mulvane for 99 years so that it can operate an EMS station near the casino. The parties agree that the land devoted to the EMS station does not add value to the subject property. Of the remaining tract of approximately 195.5 acres, 63.5 acres are used for the production of crops at the times relevant to this appeal. In this appeal, there is no dispute regarding the valuation of the agricultural property for the 2016 and 2017 tax years.

The remaining 121 acres—the valuation of which is in dispute in this appeal—"is considered to be typical of the land necessary for relatively similar casino developments and represents the land area necessary for the subject property's primary economic unit." Kansas Star completed its initial phase of construction—known as Phase 1A—in December 2011, when it opened casino operations in the temporary facilities. As Phase 1A ended in December 2012, Boyd Gaming purchased Peninsula Gaming and became the parent company of Kansas Star Casino. The next phase of the project—known as Phase 1B and included the construction of a permanent casino—was completed in January 2013.

The permanent casino is 164,790 square feet. The remaining buildings consist of a 27,772 square-foot conference center, a 57,540 square-foot equine stall and riding facility, a 6,000 square-foot maintenance building, and a 162,622 square-foot arena. The Kansas Star Arena is used to host regional entertainment events and includes 2,263 permanent seats and 1,933 seats on risers. Additionally, floor seating is available for some events that brings the total seating capacity to 6,596.

The parties agree that the revenue and expenses for the casino and the arena for the 2012 through 2016 tax years were:

|  | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| **Revenues** | | | | | |
| Gaming | $182,923,000 | $192,391,000 | $178,283,000 | $183,146,000 | $179,893,000 |
| Food & Beverage | $5,745,000 | $11,441,000 | $11,628,000 | $11,766,000 | $11,822,000 |
| Other | $1,979,000 | $3,628,000 | $4,157,000 | $4,750,000 | $4,753,000 |
| Gross Revenues | $190,647,000 | $207,460,000 | $194,068,000 | $199,662,000 | $196,468,000 |
| Less Promotional Allowances | $2,685,000 | $4,606,000 | $ 5,273,000 | $3,994,000 | $4,060,000 |
| **Net Revenues** | $187,962,000 | $202,854,000 | $188,795,000 | $195,668,000 | $192,408,000 |
| **Cost and Expenses** | | | | | |
| **Operating Costs & Expenses** | | | | | |
| Gaming | $70,398,000 | $77,943,000 | $72,863,000 | $74,318,000 | $74,465,000 |
| Food & Beverage | $3,984,000 | $8,813,000 | $7,922,000 | $8,228,000 | $8,516,000 |
| Other | $267,000 | $1,912,000 | $2,189,000 | $1,396,000 | $1,337,000 |
| Selling, General & Admin. | $15,526,000 | $22,892,000 | $18,681,000 | $19,977,000 | $19,629,000 |
| Maintenance & Utilities | $2,132,000 | $3,344,000 | $3,400,000 | $3,523,000 | $3,705,000 |
| Affiliate Management Fee | $3,071,000 | $8,357,000 | $7,914,000 | $8,264,000 | $8,057,000 |
| Preopening Expense | $1,086,000 | $91,000 | $168,000 | $280,000 | $244,000 |
| Asset Transaction Cost | $5,000 | $1,601,000 | $211,000 | $0 | $0 |
| Other Operating Items | $0 | -$95,000 | -$325,000 | $192,000 | $273,000 |
| **Total Operating Costs & Expenses** | $96,469,000 | $124,858,000 | $113,023,000 | $116,178,000 | $116,226,000 |
| **Net Income** | $91,493,000 | $77,996,000 | $75,772,000 | $79,490,000 | $76,182,000 |

It is undisputed that the Kansas Star Arena has not proven to be profitable. The arena suffered an operating loss of $707,691 in calendar year 2014, an operating loss of $160,063 in 2015, and a $211,943 operating loss in 2016. The operating loss is the total of the losses on the individual events held throughout the year and does not include fixed overhead expenses such as advertising, maintenance, and utilities. Thus, the total losses for the operation of the arena—including those fixed overhead expenses—were greater than solely the operating loss. It is estimated that the arena is substantially underutilized and sits vacant 90% of the time.

Similarly, the equine facility has proven to be unprofitable. In 2013, no equine events were held. The following year, Kansas Star hosted 5 equine events over 12 arena days. After the outdoor pavilion and stalls were constructed in 2015, Kansas Star hosted five equine events over nine days. In 2016, there were three equine events over eight total days. Despite projections to the contrary, Kansas Star has utilized the equine facility for a

6

total of 36 days in 2015 and 38 days in 2016. As a result, Kansas Star negotiated with the Kansas Lottery Commission and was allowed to scale back its permanent equine facilities—including the amount of practice arenas and permanent stalls—in favor of conference space. According to Kansas Star, it is open to hosting more equine events, but it has not had success in attracting them.

Over the years, Kansas Star has filed a series of appeals over the valuation of its real property for the purpose of imposing ad valorem tax. Significant to the current appeal, BOTA determined a value of $101.5 million for the subject property for the 2015 tax year. However, this court found that BOTA's determination was not supported by substantial evidence and remanded the case to BOTA for reconsideration of the issue of depreciation and functional obsolescence. *In re Equalization Appeal of Kansas Star Casino*, 2018 WL 3486173, at *8-9, 15-16, 21-22.

On October 17-19, 2017, BOTA conducted an evidentiary hearing to determine the valuation of the subject property for the purpose of imposing ad valorem taxes for the 2016 and 2017 tax years. Prior to the hearing, the parties compiled a joint stipulation of facts which was admitted into evidence and is part of the record on appeal. It is important to note that BOTA did not have the benefit of seeing this court's opinion regarding the 2015 tax year—which was released on July 20, 2018—when it was making its valuation determination for the 2016 and 2017 tax years.

Kansas Star Casino presented the testimony of Robert Jackson—a certified general real property appraiser. Jackson works for Bliss Associates, L.L.C., which prepared an appraisal report that served as the basis for Jackson's testimony. In addition, Kansas Star presented the testimony of Cory Morowitz, a gaming consultant, and of Scott Schroeder, Kansas Star's Director of Finance.

Jackson considered both the cost and income approaches to value. Jackson's cost approach included a land value analysis, replacement cost analysis, and an obsolescence/depreciation analysis. Beginning with land value, Jackson stated there were a limited number of comparable land sales in Kansas.

Jackson looked at the five available casino-site land transactions in Kansas, consisting of sales of the Gerlach and Wyant tracts, the two tracts that comprise the Boot Hill Casino in Dodge City, and the Hollywood Casino site in Kansas City. The unadjusted sale prices ranged from $10,391 to $215,919 per acre with a median of $77,042. After adjusting for various market factors, Jackson decided the adjusted sales range was $73,190 to $78,995 with a median of $75,572. Jackson placed primary weight on the Gerlach and Wyant tracts and settled on a land value of $76,600 per acre, or $9,300,000 in total when applied to 121.18 acres, for both tax years 2016 and 2017.

Jackson estimated reproduction costs based on actual cost data collected from Kansas Star. After accounting for inflation, Jackson's total reproduction cost estimates were $151,413,380 for 2016 and $154,413,380 for 2017. Jackson did not include an adjustment for entrepreneurial incentive, based on the premise that with owner-occupied, build-to-suit properties such as a casino, profits would be attributable to the business rather than the real estate.

Jackson used the breakdown method of estimating depreciation and functional obsolescence for the subject property. Moreover, Jackson used straight line depreciation over a 50-year life to estimate physical depreciation, which resulted in an estimate of 6% for 2016 and 8% for 2017. In addition, Jackson concluded the property suffered from significant functional obsolescence, noting:

> "There are several parts of the Kansas Expanded Lottery Act that do not conform to the standard real estate market dynamics of supply and demand. These involve the aspects

8

requiring the casino development to promote '*tourism and economic development*', as opposed to strictly maximizing financial productivity and return on investment."

By performing a combined functional and external obsolescence analysis, Jackson concluded that 52% of the real estate is obsolete due to superadequacy. For support, Jackson noted that the casino actually achieved stabilized gaming revenues in the first year of operations and did not see an increase after the ancillary improvements were built. According to Jackson, the ancillary improvements—including the arena, the events center, and the equine pavilion—are not independently profitable and have not helped to increase gaming revenues over and above the cost of construction.

Jackson found that the subject property's "ancillary improvements had a negative effect upon the overall net income of the existing Kansas Star Development." He pointed to flat revenue and a decrease in the net income over the past four years. Jackson concluded that the ancillary improvements, despite being required by the management contract, were 100% functionally obsolete, resulting in reductions of value of $74,010,860 in 2016 and $73,987,498 in 2017. After adding the land value and reproduction cost estimates, and then deducting depreciation, Jackson rendered the opinion that the fair market value for the subject property under the cost approach was $77,650,000 for tax year 2016 and $77,600,000 for tax year 2017.

Morowitz also testified that the arena and conference center suffer from significant obsolescence in the form of superadequacy. After evaluating the needs of the Wichita area market, Morowitz determined that, for its intended purpose, the Kansas Star Arena is unnecessary and unprofitable. Like Jackson, Morowitz rendered the opinion that the arena is fully functional for its intended purpose, stating that "[t]he arena operates as an arena but it doesn't add any cash flow to the operation."

9

Morowitz presented extensive evidence to show that the arena events failed to generate additional gaming revenue. Morowitz explained that the data indicated that arena events tended to crowd out more lucrative gamers in favor of casual, less lucrative gamers, resulting in a net loss in gaming revenue:

"So when you're bringing some incremental visitors who are not normal gamers, and you see it in the numbers, that $172,000 there of incremental gaming revenue on a Saturday divided by 62,000 admissions is $3 per admission which comports with everything I know about when you bring people who aren't normal gamers into a property. Some of them come in, they crowd around—five people crowd around one machine, they pull the lever once every, you know, 30 seconds instead of once every six seconds like a core gamer and they create havoc on the floor. Your best customers can't get their machine and it's an issue. And to me it almost explains what's happened to this property since they opened the arena."

Morowitz testified that the Kansas Star Arena operated at a loss and contributed nothing to its overhead expenses. The arena contributed to an overall reduction in adjusted EBITDA (excluding management fees) of $95.7 million in 2012 to roughly $85 million by 2016. Morowitz opined that the arena loses money operationally because the cost of the events exceeds the revenue gained from the events, not including overhead.

Schroeder agreed with Morowitz' opinion regarding the profitability of the arena. According to Schroeder, overhead expenses—such as utilities, management salaries, human resources, security, maintenance, marketing, valet, property taxes, legal, housekeeping, and general administrative expenses—are not allocated amongst the various departments. If any reasonable overhead expenses were charged to the arena or events center, neither would be independently profitable. Schroeder testified that Kansas Star makes every effort to earn a profit with the arena by maximizing its revenues and minimizing its expenses.

Schroeder also testified that in his experience as the finance director, in order to maximize profitability, Kansas Star would not build the arena/equine complex or the conference center. Likewise, Schroeder testified that the management fee charged by Boyd Gaming to Kansas Star pays for the support that Kansas Star receives from Boyd, such as senior leadership, information technology, human resources, purchasing, legal, internal audit, payroll, emergency management, safety, marketing, and risk management. If Kansas Star did not receive those services from its parent company, it would have to acquire those services through additional staff or outsourcing.

In response, Sumner County presented appraisal evidence through the testimony of Richard Jortberg, MAI. In addition, the County presented the testimony of Dwight Percy, who is a professional business evaluator, as a rebuttal witness. Leslie Sellers, MAI, who is the chair of the Appraisal Institute's Body of Knowledge Committee and is the Appraisal Institute's past international president, also testified on behalf of the County as a rebuttal witness.

The County retained Jortberg to appraise the subject property for tax years 2016 and 2017. Jortberg has numerous years of experience appraising casinos for taxing authorities in Colorado, and he has appraised the Kansas Star Casino for the County since 2012. Jortberg used both the cost and income approaches to valuation, but like Jackson, he ultimately decided that the cost approach was the best valuation methodology. For his cost approach, after examining sales of the tracts to acquire the subject land as well as sales from the national casino market, Jortberg concluded the $17 million paid to acquire the subject property was the best evidence of land value for 2016. Jortberg determined that a land value of $16.7 million was appropriate for 2017 based on a 2% reduction in gaming revenue since 2012.

For his reproduction cost estimate for the improvements, Jortberg utilized the subject property's actual construction costs of $135,469,653, and adjusted for inflation

11

($7,460,979) plus a 12.5% entrepreneurial incentive for a total reproduction cost estimate for 2016 of $160,796,961. For 2017, Jortberg utilized the same methodology, but he accounted for the addition of the Tin Lizard bar and restaurant inside the casino in the former location of the poker room. While the bar did not add square footage to the casino, Jortberg added value as the addition represented a new, functional source of revenue. Adjusting for inflation and entrepreneurial incentive, Jortberg concluded a total reproduction cost estimate for 2017 of $163,745,640.

Utilizing depreciation tables from Marshall Valuation Services, Jortberg determined the subject property suffered incurable physical depreciation of $4,392,089 in 2016, and $5,905,908 in 2017. Regarding functional obsolescence, Jortberg concluded that the subject improvements were designed and constructed in accordance with modern standards and were the typical type of amenities found in the regional casino market. Further, Jortberg concluded that the ancillary facilities—the arena, conference space, and the equine pavilion—were consistent with the property's highest and best use and were fully capable of being used for their designed purposes.

Jortberg disputed Kansas Star's contention that the arena was 100% obsolete. Jortberg noted that Kansas Star did not expect to make a profit from the ancillary facilities, noting that Kansas Star referred to the arena as a "loss leader" during the bidding process. Jortberg testified: "I don't see any functional obsolescence of this property subject to the management contract and the application to the government for approval purposes." Jortberg determined no external obsolescence for the property as he observed no external factor affecting the property for the assessment dates. Ultimately, Jortberg opined that value of the real property using the cost approach was $170 million in 2016 and $171 million in 2017.

Percy testified that he was qualified to determine the business valuation for a casino because his accreditation with the American Society of Appraisers "is broad and

allows me to value any business enterprise." Percy analyzed the arena's contribution to the taxpayer's overall business. From the data, Percy concluded that $5.1 million in gross revenue and up to $3.6 million in net revenue was generated by arena activity but not attributed elsewhere. Percy also used six separate methodologies and determined six separate business enterprise values (BEV) for Kansas Star. Applying differing weight to these value conclusions, Percy determined the BEV for Kansas Star was $708,935,000 for 2016 and $688,495,000 for 2017. Percy did not evaluate the value of the subject real estate, which is the subject of this appeal.

Sellers testified that he performed a review appraisal without reaching a value conclusion. After conducting a review of the Bliss Associates appraisal report, he identified 10 errors. As such, Sellers concluded that the report was not credible under USPAP Standard 1-1(a). Turning first to land value, Sellers found that Bliss Associates' size adjustments to the individual Wyant and Gerlach tract sales deviated from recognized appraisal methodology.

Sellers also disputed Bliss Associates' decision to exclude an estimate for entrepreneurial incentive, which he found deviated from generally accepted appraisal methodology. Sellers pointed out that although Jackson testified that the 14th edition of the Appraisal of Real Estate supported Bliss Associates' position, Jackson failed to note that the section he had been reading from was referring to public buildings as an example of a specialized owner-occupied building that an owner would not anticipate generating a profit from. Finally, Sellers concluded that Bliss Associates' functional obsolescence analysis deviated from generally accepted appraisal methodology.

On May 1, 2018, BOTA entered a Full and Complete Opinion concluding "that the total value for the subject property for tax year 2016 is $102,659,000, consisting of an appraised value of $120,650,000 and an agricultural use value of $9,000." Furthermore, BOTA concluded "that the total value for the subject property for tax year 2017 is

13

$102,609,000, consisting of an appraised value of $102,600,000 and an agricultural use value of $9,000." As indicated above, the valuation of the portion of the real property used for agricultural purposes for the 2016 and 2017 tax years is not in dispute in this appeal.

After citing the applicable law, BOTA took "judicial notice of its prior year's decision on the subject property." In doing so, it cited *In the Matter of the Equalization Appeal of Kansas Star Casino, L.L.C. for the year 2015 in Sumner County, Kansas*, Docket Nos. 2015-3737-EQ et al. Of course, this is the BOTA decision that was subsequently affirmed in part, reversed in part, and remanded with directions by this court. See *In re Equalization Appeal of Kansas Star Casino*, 2018 WL 3486173.

As it had done in 2015, BOTA applied a cost approach for the 2016 and 2017 tax years. In weighing the conflicting opinions offered by the parties, BOTA found the opinions offered by Morowitz—who testified on behalf of Kansas Star on the issue of substantial economic obsolescence—"to be more persuasive than the evidence presented by the County's witnesses to the contrary and [were] consistent with the subject property's actual financial data." BOTA also questioned "the efficacy" of the opinions expressed by Percy—who testified on behalf of Sumner County—regarding "the connection between arena events and [Kansas Star's] overall business . . . ." In addition, BOTA found the opinions of Schroeder regarding the casino operation and management to be persuasive.

Accordingly, BOTA determined:

"For these reasons, and noting that the subject improvements are all relatively new as well as the valuation task herein of segregating the subject real estate market value from the value of the business operating therein, the Board finds the Bliss cost approach to be the most accurate indicator of value presented. While the Board finds the substantial credible evidence supports Bliss' general determination of significant obsolescence in this relatively new development, we do, however, find that Bliss' 52%

14

total economic obsolescence determination overshoots the target. Following our derivation of economic obsolescence in the prior tax year's decision, the Board finds that a total economic obsolescence of 35% is proper for the tax year in issue."

Thereafter, Kansas Star Casino filed a petition for judicial review with this court, and Sumner County filed a cross-petition for review.

ANALYSIS

*Standard of Review*

The Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq., defines the scope of judicial review of BOTA decisions. K.S.A. 74-2426(c); see also K.S.A. 77-603(a). "The burden of proving the invalidity of the agency action is on the party asserting invalidity." K.S.A. 77-621(a)(1); see *In re Equalization Appeal of Wagner*, 304 Kan. 587, 597, 372 P.3d 1226 (2016). Accordingly, although Sumner County bore the burden of proof before BOTA pursuant to K.S.A. 79-1609, Kansas Star Casino carries the burden on its petition for judicial review and Sumner County carries the burden on its cross-petition for judicial review. See K.S.A. 77-621(a)(1); *Wagner*, 304 Kan. at 597.

Under K.S.A. 77-621(c), our review is limited, and we may only grant relief if one or more of the following factors are present:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;
"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;
"(3) the agency has not decided an issue requiring resolution;
"(4) the agency has erroneously interpreted or applied the law;
"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

15

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious."

To the extent that there is an assertion that BOTA erroneously interpreted or applied the law, our review is unlimited. *In re Tax Appeal of BHCMC*, 307 Kan. 154, 161, 408 P.3d 103 (2017). As a general rule, when construing statutory or regulatory provisions relating to the imposition of a tax, we are to construe them "strictly in favor of the taxpayer." *In re Tax Exemption Application of Central Illinois Public Services Co.*, 276 Kan. 612, 616, 78 P.3d 419 (2003). Moreover, we are to give no deference to an agency's interpretation of its regulations. *Central Kansas Medical Center v. Hatesohl*, 308 Kan. 992, 1002, 425 P.3d 1253 (2018); see also *In re Tax Exemption Application of Kouri Place*, 44 Kan. App. 2d 467, 472, 239 P.3d 96 (2010).

In our review of whether substantial evidence supports BOTA's decision, we must examine the record as a whole to determine whether there is substantial competent evidence supporting its factual findings. Substantial competent evidence possesses both relevance and substance and provides a substantial basis of fact from which the issues can be reasonably determined. *In re Wagner*, 304 Kan. at 599. Nevertheless, our role is not to reweigh the evidence, evaluate the credibility of witnesses, or engage in de novo review. See K.S.A. 77-621(d); *Williams v. Petromark Drilling, LLC*, 299 Kan. 792, 795, 326 P.3d 1057 (2014).

We may also grant relief if we find BOTA's decision to be unreasonable, arbitrary, or capricious. The test for finding arbitrary and capricious conduct depends on the

16

reasonableness of and foundation for the action. An order is arbitrary and capricious if it is unreasonable or without foundation in fact. See *In re Equalization Appeal of Tallgrass Prairie Holdings, LLC*, 50 Kan. App. 2d. 635, 659-60, 333 P.3d 899 (2014). Consequently, whether BOTA acted unreasonably, arbitrarily, or capriciously depends on the quality of its reasoning. See *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 569, 232 P.3d 856 (2010). In reviewing an agency's action, however, "due account shall be taken by the court of the rule of harmless error." K.S.A. 77-621(e).

*Ad Valorem Taxation in Kansas*

The Kansas Constitution provides that all non-exempt real and tangible personal property is subject to taxation on a uniform and equal basis. Kan. Const. art. 11, § 1(a); The Kansas Legislature has enacted a statutory system to ensure property is appraised for ad valorem tax purposes in a uniform and equal manner. K.S.A. 79-101, et seq. The foundational piece of this system is that—unless otherwise specified—all property must be appraised at fair market value as of January 1 of each taxable year. K.S.A. 79-1455.

When valuing property for ad valorem tax purposes, Kansas law requires that the valuation must be based on a fee simple interest. See *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d 122, 130, 275 P.3d 56 (2012). In other words, ownership of the fee simple interest is equivalent to ownership of all of the property rights—sometimes referred to as the whole "bundle of sticks"—associated with the subject property that can be privately owned. Although Kansas tax statutes do not refer to the term fee simple interest, "it is clear that the legislative intent underlying the statutory scheme of ad valorem taxation in our State has always been to appraise the property as if in fee simple, requiring property appraisal to use market rents instead of contract rents if the rates are not equal." *In re Equalization Appeal of Prieb*, 47 Kan. App. 2d at 130 (citing K.S.A. 79-501 and K.S.A. 79-503a).

17

K.S.A. 79-102 provides: "[T]he terms 'real property,' 'real estate,' and 'land,' when used in this act, except as otherwise specifically provided, shall include not only the land itself, but all buildings, fixtures, improvements, mines, minerals, quarries, mineral springs and wells, rights and privileges appertaining thereto." In determining valuation for ad valorem tax purposes, Kansas law assumes a hypothetical sale of the property as of January 1 of the applicable tax year. K.S.A. 79-1455 states: "Each year all taxable and exempt real and tangible personal property shall be appraised by the county appraiser at its fair market value as of January 1 in accordance with K.S.A. 79-503a . . . ."

Moreover, K.S.A. 79-503a provides:

"'Fair market value' means the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. In the determination of fair market value of any real property which is subject to any special assessment, such value shall not be determined by adding the present value of the special assessment to the sales price."

In addition, K.S.A. 79-503a sets forth a nonexclusive list of factors that may be used to determine fair market value:

"Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:

"(a) The proper classification of lands and improvements;
"(b) the size thereof;
"(c) the effect of location on value;
"(d) depreciation, including physical deterioration or functional, economic or social obsolescence;
"(e) cost of reproduction of improvements;

18

"(f) productivity taking into account all restrictions imposed by the state or federal government and local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(g) earning capacity as indicated by lease price, by capitalization of net income or by absorption or sell-out period;

"(h) rental or reasonable rental values or rental values restricted by the state or federal government or local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values;

"(j) restrictions or requirements imposed upon the use of real estate by the state or federal government or local governing bodies, including zoning and planning boards or commissions, and including, but not limited to, restrictions or requirements imposed upon the use of real estate rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended; and

"(k) comparison with values of other property of known or recognized value. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes."

So, the fee simple interest of real estate consists of tangible property—every stick in the bundle—but does not include intangible property interests. See K.S.A. 79-102; see also *In re Tax Protest of Strayer*, 239 Kan. 136, 142, 716 P.2d 588 (1986). Furthermore, appraisals for ad valorem taxation purposes must be performed in accordance with the USPAP. See K.S.A. 79-506(a); see also *In re Equalization Appeal of Johnson County Appraiser*, 47 Kan. App. 2d 1074, Syl. ¶ 9, 283 P.3d 823 (2012). "These standards are embodied in the statutory scheme of valuation, and a failure by BOTA to adhere to them may constitute a deviation from a prescribed procedure or an error of law." *Board of Saline County Comm'rs v. Jensen*, 32 Kan. App. 2d 730, 735, 88 P.3d 242 (2004).

"[USPAP] standards are embodied in the statutory scheme of valuation, and a failure by BOTA to adhere to them may constitute a deviation from a prescribed

procedure or an error of law." *In re Tax Appeal of Dillon Stores*, 42 Kan. App. 2d 881, 890, 221 P.3d 598 (2009); see also *In re 2014 Equalization Appeal of Kansas Star Casino*, No. 116,421, 2018 WL 2749734, at *20 (Kan. App. 2018) (unpublished opinion) ("BOTA cannot apply a methodology the appraisers themselves could not."). In addition, the ad valorem appraisal process must "conform to generally accepted appraisal procedures and standards which are consistent with the definition of fair market value unless otherwise specified by law." K.S.A. 79-503a. Whether an appraisal methodology estimates fair market value in compliance with USPAP—as required by K.S.A. 79-503a and 79-505—is an issue of law subject to unlimited review. See *In re Tax Appeal of Dillon Stores*, 42 Kan. App. 2d at 891-92.

*Depreciation of Kansas Star Arena*

Kansas Star Casino contends that BOTA erred when it reduced the amount of its appraiser's arena depreciation by one-third. In particular, it argues that BOTA—in making this adjustment—erred in the following ways: (1) erroneously interpreted or applied the law under K.S.A. 77-621(c)(4); (2) based its finding on a determination of fact that is not supported by the evidence in the record under K.S.A. 77-621(c)(7); and (3) reached a decision that is otherwise unreasonable, arbitrary, or capricious under K.S.A. 77-621(c)(8). Although the parties do not agree on the ultimate outcome, Sumner County agrees with Kansas Star that BOTA's depreciation analysis is not supported by substantial competent evidence.

At the outset, it is important to note that the parties relied on the same appraisers, who rendered substantially similar opinions for the 2016 and 2017 tax years as they had rendered for the 2015 tax year. Furthermore, in BOTA's determination for tax years 2016 and 2017, it adopted the depreciation analysis from its decision for the 2015 tax year. Notwithstanding, a little over two months later, this court held that BOTA's analysis for the 2015 tax year regarding superadequacy and functional obsolescence was not

20

supported by the evidence and was not compliant with the USPAP. *In re Equalization Appeal of Kansas Star Casino*, 2018 WL 3486173, at \*15-16, 22.

Specifically, this court found that for the 2015 tax year, BOTA based its decision on the incorrect premise that Kansas Star's appraiser had concluded that the arena was two-thirds overbuilt. In fact, the only witness to express that opinion was Morowitz, who was a gaming advisor and not an appraiser. *In re Equalization Appeal of Kansas Star Casino*, 2018 WL 3486173, at \*15. Kansas Star correctly points out that BOTA relied on its interpretation of Morowitz' testimony from the hearing regarding the 2015 tax year in making its determination regarding the arena's depreciation for the 2016 and 2017 tax years. In fact, BOTA stated in its decision for the 2016 and 2017 tax years that "[f]ollowing our derivation of economic obsolescence in the [2015] decision, the Board finds that a total economic obsolescence of 35% is proper for the tax years in issue." Thus, BOTA has made the same mistake for the 2016 and 2017 tax years that it made for the 2015 tax year.

As this court held in the 2015 appeal, "BOTA's conclusion that Jackson's 52% economic obsolescence figure should be reduced by one-third is not supported by evidence that is substantial when considering the record as a whole." *In re Equalization Appeal of Kansas Star Casino*, 2018 WL 3486173, at \*16. In the appeal from tax year 2015, Morowitz concluded that the subject property's ratio of gaming positions to arena seats was three times higher than the average of similar casinos. This analysis and conclusion were: (1) not part of the record in tax years 2016 and 2017; (2) not repeated by Morowitz in the hearing for tax years 2016 and 2017; and (3) is not synonymous with a conclusion that the arena is only two-thirds overbuilt. Thus, just like the previous appeal, BOTA's conclusion regarding the arena is not supported by substantial evidence when considering the record as a whole.

21

In reaching this conclusion, we adopt the analysis set forth by this court in the case of *In re Equalization Appeal of Kansas Star Casino*, 2018 WL 3486173. There is nothing distinguishing BOTA's decision and reasoning in the appeal from the 2015 tax year from its decision regarding the arena depreciation in the 2016 and 2017 tax years. In fact, both parties agree that the matter should be remanded to BOTA for further proceedings. We agree.

As Kansas Star points out, there is even less evidence in the record for the 2016 and 2017 tax years to support BOTA's determination than there was in the record for the 2015 tax year. In this appeal, Morowitz did not testify that as much as two-thirds of the arena seats may not be needed or are functionally obsolete as BOTA found he did for the 2015 tax year. See *In re Equalization Appeal of Kansas Star Casino*, 2018 WL 3486173, at *14. Again, there is no evidence in the record to support BOTA's methodology for measuring the arena's depreciation or its conclusion.

As stated in this court's decision in the appeal involving the 2015 tax year:

"The parties provide extensive support for their competing positions in their briefs and ask us to adopt their position on functional obsolescence; however, it is not our role to calculate functional obsolescence. Rather, remand to BOTA for further proceedings is appropriate. Given the opposite conclusions each side advocates and BOTA's attempt to choose a middle ground, we emphasize that our holding does not compel BOTA to adopt one of the party's positions and that a figure somewhere in between 100 percent and 0 percent might be supported by the record in this case. On remand, BOTA would have to explain its rationale for supporting a figure in between the parties' positions; it would have to point to evidence in the record supporting its figure; and its rationale would have to be USPAP compliant." *In re Equalization Appeal of Kansas Star Casino*, 2018 WL 3486173, at *16.

As also expressed by this court in the appeal arising out of the valuation of the subject property for the 2015 tax year, our role is not to reweigh the evidence, assess

22

credibility of witnesses, or make factual determinations. See K.S.A. 77-621(d). The underlying issue should be determined by BOTA and not an appellate court. Then, if necessary and through the filing of a timely petition for judicial review, BOTA's decision can be properly reviewed by this court. Consequently, we vacate the portion of BOTA's decision regarding the valuation of the Kansas Star Arena. Furthermore, we remand this matter for a determination that is supported by the evidence—as well as USPAP compliant—and for a determination of the impact of an appropriate amount of depreciation and functional obsolescence has on the overall valuation of the subject property for the purpose of imposing ad valorem tax for the 2016 and 2017 tax years.

*Commercial Land Valuation*

In Sumner County's cross-petition for review, it contends that BOTA's finding of a commercial land valuation of $76,600 per acre is not USPAP-complaint, not supported by substantial competent evidence in light of the record as a whole, and is unreasonable, arbitrary, and capricious. In response, Kansas Star Casino argues that the County is merely asking this court to reweigh the evidence in its favor. Based on our review of the record, we do not find the County's arguments on this issue to be persuasive.

At the BOTA hearing, the County's appraisal expert rendered the opinion that the purchase price of the subject property—$86,957 per acre—is the most appropriate way to determine the value of the commercial land. Conversely, Kansas Star's appraisal expert rendered his opinion by separately valuing the land used for gaming purposes from that used for other purposes. In forming his opinion that the land should be valued at $76,600 per acre, Kansas Star's expert also took into consideration the necessity of various adjustments such as market conditions, location, and utilities.

As indicated above, the property subject to valuation is composed of 195.5 acres. The parties stipulated that Kansas Star leased 63.5 acres to Mark Hardison for

23

agricultural use and that it has a leased value of $9,000 per year. Although BOTA upheld the County's classification of the remaining acreage as commercial, it adopted the opinion of Kansas Star's expert in finding that this portion of the property should be valued at $76,600 per acre or a total land value of $10,170,000 each of the tax years in question.

Kansas Star's appraisal expert based his opinion on an analysis of five comparable real estate sales—the sale of the two parcels of land that were ultimately combined to form the subject property, two sales that formed the real property on which the Boot Hill Casino is operated in Ford County, and the sale of the Hollywood Casino in Wyandotte County. Of these sales, Kansas Star's expert placed the most weight on the separate sales of the tracts that were combined to form the subject property. To arrive at the $76,600 figure, the expert relied on certain adjustments including a 60% downward adjustment on one of the two tracts of property based on its size as compared to the commercial acreage being valued in this case. In addition, Kansas Star's expert applied a 10% upward adjustment to the other tract.

The County's appraisal expert testified that the opinion of Kansas Star's expert was inappropriate because his quantitative size adjustments deviated from recognized appraisal methods. In particular, the County's appraiser expressed the opinion that "[g]enerally accepted appraisal practice is to use assemblage land sales only as a total tract because conditions of sale for the individual tracts can be misleading as an indicator of value when the developer motivations are only for the total development tract price." As such, the County's expert concluded that "[u]sing these two sales independently, and only adjusting the one sale . . . is not following generally accepted appraisal practice and results in a lower value than the data would otherwise indicate."

At the hearing, the County's expert testified:

24

"[W]hen we teach this type of analysis in our course work, we teach appraisers that it's inappropriate when you're using sales from an assemblage to cherry pick a sale out as a comparable because the buying decision from that site by the buyer or the developer was about how much he paid for the total site. And let me give you an example outside of this area.

"Let's say you have a real estate developer that's building a shopping center and they're buying nine sites to assemble for this shopping center. The problem with picking out one sale is that he starts out and he buys two or three sites, but by the time he gets to the end of it, the holdout seller, he ends up paying double what he would have paid per acre or per square foot for the other tracts. Well, many times the developer doesn't necessarily have a problem paying that price so long as his total investment for the site is under the threshold he needs to make the deal work.

"So if you're going to use those same sites as a comparable, we teach the appraisers that you must assemble them and then take the average of all of them together. You can't just pick that last guy out and say, well, they paid $500,000 an acre for this property when if you took the whole thing together it might have been $175,000 an acre.

"In this case where it becomes an issue is when we lay the sales out and there's an adjustment made for size to one of the comparables. It's—improper for them to do that because of the same economic theory. If you're going to use those sales and I recalculated, I think I came up with roughly 87,000 an acre for the total site, about what the developers put together for this casino, and if you're going to use those sales and adjust, you should use them as part of that—that number, 87,135 I believe it was."

As Sumner County points out, USPAP Standard 1-1 provides that "[i]n developing a real property appraisal, an appraiser must be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal[.]" As such, the County argues that the opinion of its expert established that the opinion expressed by Kansas Star's expert was subjective and not within recognized appraisal methodology. On the other hand, Kansas Star argues that appraisers should avoid using the sum value of an assemblage to develop an opinion of market value of the whole.

25

Kansas Star relies upon a textbook entitled The Appraisal of Real Estate, Appraisal Institute, 364 (14th ed. 2013), which states:

"Appraisers should also recognize that a buyer who purchases a site with the intent to assemble it with other parcels might have to pay a higher-than-market value for that site, particularly for properties acquired near the end of the assemblage period, sometimes called holdouts or hold out parcels. Appraisers should avoid summing the costs of the component parts (i.e, the smaller parcels) to develop an opinion of the market value of the whole (i.e. the larger assembled parcel). Conversely, they should avoid assigning the unit value of the whole to the components without other market evidence to support those conclusions."

Hence, Kansas Star asserts that BOTA properly avoided combining the costs of the separate tracts to derive the per acre value of the subject property. It also notes that the method used by its expert was appropriate because 63.5 acres of the subject property are classified as agricultural rather than commercial. Finally, Kansas Star suggests that the County is simply asking this court to reweigh the evidence and that this court has already rejected a substantially similar—if not identical—argument arising out of the appeal of BOTA's valuation of the subject property for the 2015 tax year.

Essentially, we are faced with a difference of opinion regarding the best method to determine the value of the commercial land. Based on our review of the record, we find that there was substantial competent evidence presented to justify either method. We do not find that the methodology adopted by BOTA violates USPAP Standard 1-1.

In the appeal from tax year 2015, this court considered the same issue and concluded: "Ultimately, we are unpersuaded by the County's arguments that BOTA's decision was unreasonable, arbitrary, or capricious. BOTA's land value conclusion of $76,500 per acre is supported by substantial evidence in the record. Any adjustment due to the classification of the drainage area as commercial property would have been

26

insignificant." *In re Equalization Appeal of Kansas Star Casino*, 2018 WL 3486173, at *21. Similarly, we are unpersuaded by the County's arguments in this appeal and find that BOTA's valuation of the commercial land at $76,600 per acre is supported by substantial competent evidence and is reasonable based on the conflicting evidence presented by the parties.

*Inclusion of Entrepreneurial Incentive*

Next, Sumner County argues that BOTA erred by failing to include a 12.5% entrepreneurial incentive that its expert included in calculating the replacement cost of the existing structures associated with the subject property. An entrepreneurial incentive is "the amount an entrepreneur expects or wants to receive as compensation for providing coordination and expertise and assuming the risks associated with the development of a project." The Appraisal of Real Estate, Appraisal Institute, 573 (14th ed. 2013). In other words, an entrepreneurial incentive is "an economic reward (above and beyond direct and indirect costs) sufficient to convince an entrepreneur to take on the risk associated with that project in the market." The Appraisal of Real Estate, Appraisal Institute, 573 (14th ed. 2013).

When applying the cost approach in appraising commercial property, the appraiser needs to estimate "the current cost to construct a reproduction of (or replacement for) the existing structure, including an entrepreneurial incentive or profit." The Appraisal of Real Estate, Appraisal Institute, 562 (14th ed. 2013). BOTA rejected the County's request to include a 12.5% entrepreneurial incentive in its valuation of the subject property. In doing so, BOTA took judicial notice of its previous order from the 2015 tax year in which it had also rejected the request to include a 12.5% entrepreneurial incentive figure, explaining that "the subject property was a build-to-suit, owner-occupied property where development costs were part of the business rather than the real estate."

27

The County points to the report of its expert in support of its position that BOTA erred in rejecting its 12.5% figure for entrepreneurial incentive. Certainly, there is evidence in the record upon which BOTA could have found the inclusion of an entrepreneurial incentive was appropriate. However, based on our review of the record, we find that we are once again faced with conflicting opinions regarding the valuation of the subject property. Specifically, we note that Kansas Star's appraisal expert included the following paragraph in his report:

"Typically, with build to suit, owner-operated properties that are reliant upon the operation of the associated business located with the real estate for the generation of revenue/income, entrepreneurial profit is not considered part of the overall development costs. This is due to the 'profit' component typically being considered part of the business operation, but not the real estate itself. Therefore, for the purposes of analyzing the fee simple real estate component of the subject's gaming and entertainment development, no separate entrepreneurial profit is considered applicable and none has been included."

As this court found in the appeal arising out of the 2015 tax year, "the burden is on the County to support its value, and the County points to no evidence in the record supporting its position that BOTA erred in rejecting its 12.5 % figure for entrepreneurial incentive." *In re Equalization Appeal of Kansas Star Casino*, 2018 WL 3486173, at *22. This finding is still true, and we conclude that the County has failed to show that BOTA's decision not to include an entrepreneurial incentive for the 2016 and 2017 tax years is not supported by substantial competent evidence or is otherwise unreasonable, arbitrary, or capricious.

*Consideration of Management Contract*

Finally, Sumner County contends that BOTA erred by failing to consider the value of Kansas Star Casino's management contract as part of its analysis of the fair market value of the commercial property. We note that in previous appeals, Kansas Star has

asserted that BOTA's valuation was erroneous because it included, in part, the value attributable to the management contract. However, this court found the management contract could be considered in the valuation process because it is "an economic condition affecting the value of the subject property." *In re Equalization Appeal of Kansas Star Casino*, 2018 WL 2748748, at *15.

Here, the County points to the fact that Kansas Star's expert rendered the opinion that the subject property's highest and best use is as "a casino gaming facility that is appropriately sized and designed to meet the demand of the market, in order to maximize gaming associated revenues, while minimizing capital investment." The County claims this opinion is flawed because KELA does not allow gaming operators to pursue whatever means they see fit to maximize profits. As a result, the County argues that the opinion of Kansas Star's expert—that a different, less substantial mix of amenities may be more productive—improperly ignores the actual management contract in place. See K.S.A. 79-503a(j).

As indicated above, K.S.A. 79-102 provides that "the terms 'real property,' 'real estate,' and 'land,' when used in this act, except as otherwise specifically provided, shall include not only the land itself, but all buildings, fixtures, improvements, mines, minerals, quarries, mineral springs and wells, rights and privileges appertaining thereto." Notably, the statute does not mention contract rights. See *In re Equalization Appeal of Prieb*, 47 Kan. App. 2d at 130-31. However, as previously recognized by this court, the management contract is a privilege that affects the value of the real estate in this case. See *In re Equalization Appeal of Kansas Star Casino*, 2018 WL 2748748, at *14-15. As such, BOTA may take the management contract into consideration in valuing the subject property but is not required to do so.

The only support the County has for its position is the opinion of its expert witness. The County's expert suggests the failure by BOTA to consider the management

contract's impact on the value of the subject property constitutes a deviation from recognized appraisal practices and is not USPAP compliant. Not surprisingly, the respective appraisal experts retained by the parties express differing opinions. However, simply showing a difference of opinion falls short of the County's burden to establish error or a failure to comply with USPAP standards.

In addition, it is unclear whether BOTA considered the value of the management contract or not. Instead, all we know from reviewing the record is that BOTA did not include the management contract in reaching its valuation. Although BOTA adopted the cost approach to value as set out in the report of Kansas Star's expert, it was not bound to adopt one appraisal or another. Rather, BOTA is merely directed by our Legislature to support its conclusions with substantial competent evidence in the record. Thus, we conclude that the County has failed to show error in BOTA's failure to include the management contract in determining the fair market value of the subject property.

CONCLUSION

In conclusion, we affirm BOTA's decision regarding the valuation of the subject property for the 2016 and 2017 tax years with the exception of its conclusions relating to depreciation and functional obsolescence as it relates to the Kansas Star Arena. As we did in the appeal related to the 2015 tax year—and for the same reasons—we vacate that portion of BOTA's decision. We remand this matter to BOTA with directions to reconsider the issue of depreciation and functional obsolescence as it relates to the arena. Furthermore, BOTA is directed to determine the impact of depreciation and functional obsolescence on the overall valuation of the subject property for the purpose of imposing ad valorem tax for the 2016 and 2017 tax years.

Affirmed in part, vacated in part, and remanded with directions.